**Kyle A. Sturm, OSB 080214**
kyle@foremansturm.com
**Nicholas A. Thede, OSB 075460**
nick@foremansturm.com
FOREMAN STURM & THEDE LLP
P.O. Box. 13098
Portland, Oregon 97213
T: 503.206.5824

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DR. HERBERT SEMLER and SHIRLEY SEMLER, individuals,<br><br>    Plaintiffs,<br><br> v.<br><br>CHARTIS PROPERTY CASUALTY COMPANY, a Pennsylvania company,<br><br>    Defendant. | Case No. 3:18-cv-00624-AC<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br>**(Oral Argument Requested)** |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant Chartis Property Casualty Company ("Chartis") asks the Court to dismiss this lawsuit without reaching the merits of the claims asserted by its insureds, plaintiffs Dr. Herbert and Shirley Semler ("Semler"). The suit limitation provision does not apply here because Semler filed suit within the timeframe provided in the policy. Chartis advances a broad application of the provision, even though it continued to accept and consider information submitted by Semler and failed to make a final determination of coverage until well after it now contends the time to file

suit lapsed.  The evidence, when viewed in a light most favorable to Semler, requires the conclusion that the suit limitation period did not begin to run until August 24, 2017.  That is the first date that Chartis was finally able to "determine" the "amount of loss," and definitively inform Semler that it would no longer consider additional payment on the claim and denied his request for appraisal.  This conclusion is consistent with both the case law cited by Chartis is its motion for summary judgment and using the interpretive tools required under law.  Upon receiving a final determination from Chartis, Semler filed suit well within the 13 months he had under the terms of the policy.

Chartis also attempts to take advantage of Semler's purported failure to comply with the suit limitation provision, even though Chartis's own acts and omissions were the root cause of the issue.  Oregon requires an insurance company to notify its insured of any suit limitation contained in a policy.  It is undisputed that Chartis failed to notify Semler of any such provision until more than five years after the loss, and almost two years after Chartis now contends the time-period to file suit expired.  Throughout that period, Chartis accepted, considered, and requested information relating to the claim.  Based on Chartis's actions, Semler continued to expend time and resources pursuing the claim and preparing to repair his damaged home.  He reasonably and justifiably relied on Chartis's continued communication and consideration of the claim when he delayed filing suit.  All the while, Chartis was acting with the knowledge that it could assert the suit limitation to avoid liability.  Had he known Chartis would ultimately rely on the provision, Semler would have filed a lawsuit several years before he did.  Chartis should be equitably estopped from asserting the suit limitation provision.

Semler respectfully requests that the Court reject Chartis's attempt to invoke the suit limitation to bar this lawsuit, deny its summary judgment motion, and allow this case to proceed to a trial.

## FACTUAL BACKGROUND

### A.  Background

Since 1983, plaintiffs Dr. Herbert and Shirley Semler ("Semler") have owned the home located at 1808 N Ocean Avenue, Gearhart, Oregon.  Declaration of Dr. Herbert Semler ("Semler Decl."), ¶ 2.  It was constructed in 1941 and was one of the few residential structures designed by world-renowned architect Pietro Belluschi.  Id.  It is one of a kind.  Id.  The 3,386 square-foot home includes five bedrooms and three-and-a-half bathrooms and sits on a 3.83-acre lot.  Id. Semler purchased an insurance policy from defendant Chartis Property Casualty Company ("Chartis") that was in effect from February 1, 2012 to February 1, 2013 ("the policy").  Doc. 20-1 at 1.[1]  The policy provided coverage for guaranteed rebuilding cost of up to $991,136 for damage to the home and replacement cost of an additional $495,568 for contents.  Id.

### B.  The Loss and Initial Adjustment of the Claim

The policy was in effect when on June 5, 2012, a cracked water supply line in an upstairs bathroom caused damage to the bathroom, along with the kitchen and pantry located below it. Semler Decl., ¶ 3.  The leak was discovered by Semler's housekeeper, who had attended to the home for years and checked on it regularly.  Id.  Semler promptly reported the loss to Chartis the next day.[2]  Id.  Chartis retained the services of an independent adjuster, Trevor Winter, to inspect

---

[1] In an effort to avoid redundancy, where possible, plaintiffs refer to the electronic file reference number of pleadings filed in this lawsuit.

[2] Dr. Semler was the primary contact and handled all matters relating to the claim.  Semler Decl., ¶ 4.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

the home and to meet with Semler and his contractor at the time.  Id. at ¶ 4.  Following that

inspection, a Chartis claim note dated July 9, 2012, described the loss as follows:

> Damages: The upstairs bathroom has wood paneling on the wall and
> ceiling.  It is an older paneling and will not be able to match.  The
> paneling is wet and will most likely have to be replaced.  The
> bathroom flooring is vinyl, but is placed over the top of a fir tongue
> and groove floor that continues out into the hallway.  The wood
> flooring is wet and cupping.  The flooring in the hallway may be
> able to be saved, but not sure about the wood under the vinyl
> flooring.
>
> The kitchen will have to be gutted.  The sheetrock on the ceiling and
> walls is saturated.  The cabinets are custom built in place and will
> not survive being detached and reset due to their age and the manner
> they were constructed.  Many of the doors were swelled and could
> not close correctly.  The insured had a lot of contents within their
> cabinets and it took several days to remove and pack the items out
> of them.  The kitchen flooring will have to be replaced.  There is a
> butler pantry off of the kitchen.  It has the same damage as the
> kitchen and will need to be gutted as well.

Declaration of Nicholas A. Thede ("Thede Decl."), Ex. 1 at 1-2.  Mr. Winter also reported to

Chartis on July 9, 2012, that he was still working with Semler's contractor to "get an agreed cost

of repair" and "finalize the scope and pricing."  Id. at 2-3.  Semler ultimately did not select that

contractor to perform the repair work.  Semler Decl., ¶ 4.

Following Mr. Winter's initial inspection, on June 30, 2012, Chartis issued a letter to

Semler enclosing payment in the amount of $53,493.80.  Doc. 20-2.  That first payment constituted

Chartis's initial estimate of the costs to repair the damage to the home ($48,869.63) and emergency

remediation services ($9,624.17), less the deductible ($5,000.00).  Id. at 1.  Semler accepted the

payment as an initial advance on the loss but did not believe this payment would be sufficient to

repair the damage to their home.  Semler Decl., ¶ 5.  Chartis acknowledged the initial payment

was based solely on Mr. Winter's estimate, seemingly inviting Semler to provide an estimate from

a contractor of their choosing.  Doc. 20-2 at 1.  The letter accompanying Chartis's initial payment

also requested documentation from Semler detailing spoiled food items that were in the home at the time of the loss and indicated the only portion of the claim that Chartis denied was for the cost to repair the cracked supply line.  Id. at 1-2.  The letter did not inform Semler that the claim was closed, did not state that Chartis was reserving its rights under the policy, and did not inform Semler that the policy contained a suit limitation period.  *See* id.

Following the initial payment, Semler did not communicate with Chartis until April 2014, because he was suffering from a life-threatening health condition.  Semler Decl., ¶ 6.[3]  Semler was not able to put any effort toward retaining contractors to provide estimates for the damage, proceed with any repair work, or follow-up with Chartis or perform any activities on the claim.  Id.

**C.  Continued Adjustment of the Claim**

On or about April 1, 2014, Semler's insurance broker Rosana Carr[4] presented Chartis with an invoice for services performed by Angela Danadjieva, a protégé of Mr. Belluschi, on behalf of Semler.  Declaration of Rosana Carr ("Carr Decl."), ¶ 4, Ex. 1.  Ms. Danadjieva performed design-related work for anticipated repairs to the home.  Semler Decl., ¶ 7.  Semler incurred the cost of Ms. Danadjieva's services and presented her invoice to Chartis for payment because he believed Chartis was willing to consider this invoice as part of the claim and pay it and because they had not been made aware of any time limitation on their ability to seek payment or to assert any legal rights they had under the policy.  Id.  On April 3, 2014, Shirley Biggs, the Chartis internal adjuster assigned to Semler's claim, accepted Ms. Danadjieva's invoice but requested background information concerning specific charges before any further payments would be issued.  Thede

---

[3] Dr. Semler is currently 89 years old and will turn 90 years old on August 30th.  Semler Decl., ¶ 6.  At the time of this illness, he was between 83 and 85 years old.

[4] Ms. Carr assisted plaintiffs in presenting information in support of their claim with Chartis.  She did not provide any advice regarding coverage for the claim, but simply assisted in presenting information relating to it.  She effectively served as a conduit for information.  Carr Decl., ¶ 3.

Decl., Ex. 1 at 4-6. Chartis did not object to Semler's additional claim information on grounds of timeliness. *See* id. Rather, it was accepted in due course and the insurance claim investigation continued. Id.

On behalf of Chartis, Mr. Winter conducted an in-person meeting with Semler and Ms. Carr in-person on April 23, 2014, to discuss the claim. Id. at 8-9; Semler Decl., ¶ 8; Carr Decl., ¶ 5. Following this meeting, Mr. Winter informed Ms. Biggs that Chartis "may owe for more." Thede Decl., Ex. 1 at 7. Mr. Winter further explained in his report on the meeting that they discussed Ms. Danadjieva's invoice, selection of a new contractor to begin repairs, and issues concerning payment for contents and spoiled food items. Id. at 8-9. Mr. Winter also confirmed his next steps in the adjustment of the claim were to obtain an estimate from Semler's chosen contractor that would allow them to reach "an agreed scope" of the repair work to return the home to pre-loss condition, consider an additional inspection with the contractor, and continue to "work with the [Semlers] to make sure any damage to their contents is accounted for and agreed upon." Id. at 9. In late June 2014, Mr. Winter again discussed the claim with Dr. Semler, including further information about selection of a contractor and for, the first time, discussing coverages available for additional living expenses (ALE).[5] Id. at 10; Semler Decl., ¶ 9.

Ms. Carr later submitted to Chartis an estimate dated June 29, 2014, from Semler's new contractor, Greg Larson Construction ("Larson"). Carr Decl., ¶ 6. Ms. Carr also submitted a number of receipts from Semler relating to their claim for ALE. Id. Following receipt of Larson's estimate, Mr. Winter requested additional information from Larson regarding certain items contained in the estimate. Mr. Winter wrote in an August 6, 2014, report that he "will continue to

---

[5] ALE expenses are generally described as any "reasonable increase in living expenses incurred by you in maintaining your household's usual standard of living." Doc. 20-1 at 9. This typically includes meal and lodging expenses incurred prior to repair of the home.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

work with the insureds [sic] contractor to reach an agreed cost" and "will revisit the loss location in an effort to reach an agreed scope and cost of repairs."[6] Thede Decl., Ex. 1 at 11.  He also indicated he would review Semler's receipts to determine the amount of ALE owed.  Id.

Mr. Winter met with Semler and Larson at the home on August 28, 2014.  Id. at 12-14; Semler Decl., ¶ 12.  They performed a walk-through and discussed their estimates for purposes of reaching the agreed-upon scope of work and cost to perform that work.  Id.  Semler and Mr. Winter also discussed various open issues regarding contents, spoiled food items, and the ALE claim.  Id. Following the meeting, on September 22, 2014, Larson provided Mr. Winter with a revised estimate.  Mr. Winter had questions regarding some of the items on the estimate and requested Larson provide additional information.  Mr. Winter also revised his estimate following the meeting to include additional amounts for repairs to the structure.  No agreement was reached on either scope or cost.  In his report on the meeting, Mr. Winter indicated he would "continue to work with the insureds [sic] contractor to reach an agreed cost" and inquire with Chartis whether he should "pursue more information from the insured on the contents they are claiming as damaged."  Thede Decl., Ex. 1 at 12-14.

In a letter dated October 9, 2014, Chartis indicated it was issuing what it described as a "final supplemental check" for $6,008.69.  Doc. 20-6 at 1.  This letter did not inform Semler that their claim was closed or that Chartis was reserving its rights under the policy.  *See* id.  It also did not inform Semler that there was any time limitation for them to seek additional payment on the claim or assert their legal rights against Chartis.  *See* id.  Rather, as with prior correspondence, the

---

[6] In typical insurance claim, the insurance company and policyholder initially work on agreeing on the scope of work to return the property to pre-loss condition. After reaching an agreed upon scope of work, the parties then work on reaching an agreement on the cost to perform the construction in the agreed scope of work.  Without an agreed upon scope of work, it is virtually impossible to agree on the cost to return damaged property to pre-loss condition.

letter briefly explained the basis of Chartis's additional payment.  Id. at 1.  Semler continued to believe the claim was active, and that agreements still needed to be reached on all aspects of the claim.  Semler Decl., ¶ 13.

On October 24, 2014, Chartis conceded in an email message to Semler and Ms. Carr that it owed more to Semler on their claim.  Doc. 20-8 at 4-7.  It issued a new payment of $10,632.86, which was for additional undisputed amounts owed for structural repairs ($5,119.73), ALE ($1,613.13), spoiled food items ($300.00), and contents ($3,600.00).  Id.  As with the prior letter, the October 24 email message did not inform Semler that their claim was closed, did not notify them of any timing concerns for the claim or a lawsuit, and did not expressly reserve Chartis's rights under the policy.  *See* id.  Ms. Carr responded on behalf of Semler on October 29, 2014, indicating Semler did not agree that the amount of the additional payment was sufficient to repair the home or resolve the claim.  Id. at 4; Carr Decl., ¶ 7, Ex. 2.  Ms. Biggs responded on November 3, 2014, stating that Chartis would not issue any additional payment based on the information available at the time, but noted that "[a]s for now our settlement stands" but that "we will gladly review" additional information submitted in support of the claim.  Doc. 20-8 at 1.  Ms. Biggs's email response again did not indicate that the claim was closed, notify Semler of any suit limitation period, or state that Chartis was reserving all of its rights.  *See* id.  Semler again took this as an invitation to provide additional information and that Chartis would continue to adjust their claim and issue additional payments.  Semler Decl., ¶ 13.

Between November 3, 2014, and July 2017 there was another lapse in communication between Chartis and Semler.  Semler Decl., ¶ 14.  As with the prior interruption, Dr. Semler was

again dealing with a serious, life-threatening illness.  Id.  As a result, Semler was not able to continue pursuit of the claim.[7]

**D.  Final Determination of the Loss and Denial**

On July 19, 2017, Ms. Carr submitted to Chartis a contract between Semler and Tim Beatty Builder & General Contractor ("Beatty").  Carr Decl., ¶ 8, Ex. 3.  Ms. Carr requested that Chartis "reopen" the investigation and adjustment of the claim.  Id.  Semler sought out and contracted with Beatty because he believed Chartis was still prepared to consider and pay the invoice as part of its ordinary adjustment of the claim.  Semler Decl., ¶ 15.  Patrick Flaherty responded on behalf of Chartis on July 20, 2017, and accepted the Beatty estimate, but noted further information would be required before additional payment would be issued "on this claim that is now over 5 years old." Thede Decl., Ex. 1 at 15.  In a separate email of July 24, 2017, Ms. Biggs requested additional information so that Chartis could evaluate payment of Beatty's estimate.  Id. at 16.

In addition to communication with Semler, Ms. Biggs asked Mr. Winter to evaluate Beatty's proposal.  Id. at 17.  Mr. Winter contacted Beatty to discuss the proposal and to request additional information supporting the cost and scope.  Id. at 18-19.  Mr. Winter met in-person with Semler and Beatty at the home on August 14, 2017.  Thede Decl., Ex. 1 at 20-23.  During the meeting, they conducted a walk-through of the home and Beatty provided additional documentation supporting the contract price.  Id.  On August 24, 2017, Ms. Biggs sent Semler a letter declining to make further payment on their claim.  Doc. 20-11.  For the first time since the claim was submitted, Chartis informed Semler that "at this time [it was] closing this claim as we have verified that no additional monies are owed" and cited the "Legal Action Against Us" paragraph from the policy (*i.e.*, suit limitation provision).  Id. at 2.

---

[7] During this period, Dr. Semler was between 86 and 88 years old.

On September 1, 2017, Ms. Carr noted Semler's disagreement with Chartis's refusal to issue additional payment and invoked their right to appraisal under the policy.[8] Thede Decl., Ex. 1 at 24.  Mr. Flaherty and Kathleen Spinella of Chartis suggested that Ms. Biggs retain counsel to obtain a legal opinion concerning the viability of Semler's request for appraisal.  Id. at 25.  In her recommendation to retain counsel, Ms. Spinella inquired: "Was the agreement with the insured and/or his contractor in writing?"  Id.  There is no response to Ms. Spinella's question in the claim file.  There is also no evidence that Semler ever reached an agreement with Chartis regarding the cost to repair the home.  Just the opposite is true because Semler never reached an agreement with Chartis to resolve the claim.  Semler Decl., ¶ 18.  Chartis rejected Semler's request for appraisal in a letter from Ms. Biggs of September 21, 2017.  Doc. 20-12.  The letter cited the suit limitation provision as a basis for refusing to proceed with appraisal and closing the claim.  Id. at 2.

Semler was not represented by an attorney throughout the claim process.  Semler Decl., ¶ 18.  The undersigned counsel was engaged with respect to the claim in December 2017 and filed the present lawsuit on April 13, 2018.  Id.  Semler never agreed that the payments issued by Chartis were sufficient to resolve the claim.  Id.  Semler did not initiate a lawsuit or request appraisal earlier in the claims process because he believed, based on their correspondence with Chartis, that the claim remained open and that the claim would continue to be adjusted in the normal course. Id.  If Semler had been informed of the suit limitation period, he would have complied with it.  Id. Semler and Ms. Carr were never informed of the suit limitation provision until the letter of August 24, 2017.  Id.; Carr Decl., ¶ 9.  Semler continued to spend time and money throughout the claims process to gather and provide information relating to the claim because he believed the claim

---

[8] In the insurance context, appraisal is a statutory and contractual procedure available to the insurance company or policyholder to submit disagreements in cost to an appraisal panel to determine the amount of loss.

remained open, that additional payment would be made on the claim, and because Chartis accepted and continued to request and review additional information provided in support of the claim. Semler Decl., ¶ 18.  Given Chartis's ongoing refusal to go to appraisal and provide additional coverage, Semler proceeded with repairing the home at his own cost.  Id. at ¶ 19.  Beatty completed those repairs in June 2018 for the cost contained in document provided to Chartis in July 2017.  Id.

## ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate only when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The Court must view the evidence in the light most favorable to Semler and decide from that evidence whether any genuine issue of material fact exists.  *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010) (quoting *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996)).

As the nonmoving party, Semler's evidence must "be believed, and all justifiable inferences are to be drawn in [Semler's] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "A 'justifiable inference' is any inference that is "'rational' or 'reasonable.'"  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2s 1539, 1542 (9th Cir. 1989) (internal citations omitted).  "Where conflicting inferences may be drawn from the facts, the case must go to the jury."  *Munger v. City of Glasgow Police Dept.*, 227 F.3d 1082, 1087 (9th Cir. 2000) (citations and quotations omitted).

**B. The suit limitation provision does not preclude this lawsuit because the "amount of loss" was not "determined" until August 24, 2017, and Semler filed this action well within the one year of that date as permitted by the policy.**

Chartis concedes in its motion that the suit limitation in Semler's insurance policy "provides an insured with a year to bring suit, with time beginning to run upon determination of 'the amount of loss.'" Doc. 19 at 9. Semler does not dispute that interpretation of the suit limitation provision for purposes of this argument because Chartis admits it is more favorable than the statutory suit limitation provision.[9] Based on this interpretation, Chartis correctly observes that the issue to be decided is when the "amount of loss" was "determined." Doc. 19 at 9. It incorrectly concludes, however, that the suit limitation period began running on November 3, 2014. Id. at 11. The case law relied upon by Chartis supports Semler's contention that the "amount of loss" was actually "determined" on August 24, 2017. That is the date when Chartis finally and definitively informed Semler that it was closing the claim and would not issue any additional payment. Semler filed this lawsuit on April 13, 2018, which is well within the time-period permitted by the policy.

Chartis relies exclusively on the out-of-state decision in *Majagah v. AIG Prop. Cas. Ins. Agency*, No. 15-cv-06178-SDW-SCM, 2016 WL 475362 (D.N.J. Feb. 8, 2016). The *Majagah* court concluded that the amount of loss was "determined" when the insurance company issued its final denial of the claim. *Id.* at *3; *see also* Doc. 19 at 10 (reciting block quote from the case). If the reasoning in *Majagah* is applied here, the suit limitation period began to run when Chartis

---

[9] Oregon courts have explained that the purpose of the suit limitation statute "is not to set a maximum time in which a lawsuit may be filed. Rather, it is to establish a contractual limitation of [two years] which cannot be reduced further by contract. The effect of [the statute] is not to displace the contractual statute of limitation, but to take from insurers the power to contractually impose a short limitation of less than [24] months." *Ben Rybke Co. v. Royal Globe Ins. Co.*, 293 Or. 513, 518, 651 P.2d 138 (1982).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

finally and definitively informed Semler that it would not issue any further payment on their claim. That did not occur until August 24, 2017.

Prior to that date, Chartis's communications and actions objectively and subjectively indicated it was continuing its adjustment of Semler's claim. For example, up to that August 24, 2017, letter Chartis: (1) assessed and considered payment of additional amounts each time Semler contacted them; (2) issued additional payments; (3) consistently requested additional information from Semler and his contractor whenever new information was provided; (4) sent Mr. Winter to the home for a site inspection each time a contractor submitted information; (5) never expressed to Semler that the claim was being closed or that no further information would be considered; (6) failed to reserve its rights under the policy;[10] and (7) did not inform Semler of the suit limitation provision in the policy. If Chartis had made a conclusive determination regarding the amount of Semler's loss at any date prior, it would have stated so in the same plain terms it did in its August 24, 2014, letter and subsequent correspondence. Given these undisputed points, Chartis had not "determined" the amount of Semler's loss until it issued the final denial letter.

Chartis interprets its policy to provide 13 months from the date the amount of loss is "determined" for a policyholder to file suit. *See* Doc. 19 at 11. Based on this interpretation, Semler had until September 25, 2018, to file suit. Semler filed this suit on April 13, 2018, more than five months before the deadline to do so. Chartis's argument that this lawsuit is barred by the suit limitation provision fails, and the Court should deny Chartis's summary judgment motion.

---

[10] An instructive decision on the importance of an insurance company expressly reserving its rights to preserve time-related provisions is *Patton v. Mut. of Enumclaw Ins. Co.*, 238 Or. App. 101, 242 P.3d 624 (2010). There, the issue was application of the time-based conditions to recover replacement cost benefits. The court emphasized the insurance company's attorney's repeated statements in correspondence to the policyholder that it was reserving its rights under the policy—including to assert the conditions for recovery of replacement cost benefits—in concluding that the policyholder was required to comply with the provision to recover the benefits.

Page 13    PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**C. The term "determined" as used in the policy's suit limitation provision requires that the insurance company issue a final statement of the amount of loss following its investigation of the claim.**

The parties agree that the key policy term in the present dispute is "determined," which is not expressly defined in the policy. Doc. 19 at 9. As noted above, Chartis relies exclusively on the *Majagah* case for its application of the suit limitation provision. However, New Jersey law on interpretation of insurance policies is materially different than Oregon law. As detailed in *Majagah*, New Jersey has adopted the doctrine of reasonable expectations (2016 WL 475362 at *3),[11] while Oregon looks to determine the plain meaning of the contract language without reference to the policyholder's subjective expectations. *See Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Or.*, 313 Or. 464, 469, 836 P.2d 703 (1992).

Under Oregon law, where a particular term is not defined by the policy, the court must ascertain the term's plain meaning. *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 308, 985 P.2d 1284 (1999). Oregon courts have looked to the dictionary to assess the plain meaning of an undefined term. *See Dewsnup v. Farmers Ins. Co. of Or.*, 349 Or. 33, 40, 239 P.3d 493 (2010) (consulting the dictionary to define the term "roof"). *Webster's* defines "determine" as follows:

> 1 *a* **:** to fix conclusively or authoritatively <a council was set up to *determine* national policy> *b* **:** to settle a question or controversy about **:** decide by judicial sentence <the court heard and *determined* the plea> *c* **:** to come to a decision concerning as the result of investigation or reasoning <an attempt to *determine* the date of his death> *d* **:** to settle or decide by choice of alternatives or possibilities <*determine* the list of guests to be invited> *e* **:** to set up as a goal or purpose **:** resolve upon <when did Thoreau *determine* to become a man of letters — H. S. Canby>

---

[11] In the context of insurance policy interpretation, the doctrine of reasonable expectations holds that where there are two reasonable interpretations of a policy the construction that favors the expectations of the insured is applied. *Majagah*, 2016 WL 475362 at *3.

*Webster's Third New International Dictionary, Unabridged*, s.v. "determine," accessed August 10, 2018, http://unabridged.merriam-webster.com. Based on this definition of "determine," the plain meaning requires that the decision be final (*i.e.*, conclusive, authoritative, settled). Accordingly, the amount of a loss has not been "determined" when there is a continuing investigation or negotiation on the issue.

Chartis did not render a final and conclusive decision on the claim until it issued its denial letter on August 24, 2017. Prior to that point, Chartis continued to adjust the loss to assess the amount it owed on the claim. Chartis had not reached a conclusive decision on the claim, nor had it expressly and conclusively informed Semler that no more payments would be issued, the investigation and adjustment of the claim was concluded, and the claim was closed. Once that letter was issued, Semler needed to sue Chartis if he wanted any further payment.

This interpretation also does not implicate the concerns outlined by the court in *Majagah*. There,[12] the court indicated that the suit limitation provision could not be interpreted in a manner that would provide the policyholder with the unilateral ability continue the suit limitation period. *Id.* at *3. Instead, the plain meaning outlined above simply requires that the insurance company come to a final decision before the suit limitation period begins to run. If the parties cannot agree on the determination of the amount of loss, Chartis need only unambiguously and conclusively inform its policyholder of that decision to trigger the running of the suit limitation period. Here, Chartis did not do that, or anything close to it, until August 24, 2017. This is particularly the case when the facts are viewed in a light most favorable to Semler, as they must when considering Chartis's attempt to invoke the suit limitation to block this lawsuit. This result is fair and consistent

---

[12] Semler is not advancing the same ambiguity argument as the policyholder in the *Majagah* case. Semler agrees with the court's rejection of the policyholder's position there.

with the terms of the policy and stated aim of suit limitation provisions to allow a fixed timeline for insurance companies to assess their outstanding risks.

**D. Chartis should be estopped from asserting that the suit limitation provision operates to bar this lawsuit because Chartis failed to inform Semler of the provision despite an obligation to do so, Semler had no knowledge of the provision, and Semler justifiably relied on Chartis's representations that the claim was still being considered.**

Chartis should be equitably estopped from relying on the suit limitation provision to block this lawsuit from proceeding to the merits. Under Oregon law, an insurance company is estopped from relying on a policy provision when (1) the insurance company made a false representation, (2) the representation was made with knowledge of the facts, (3) the policyholder was ignorant of the truth, and (4) the policyholder justifiably and reasonably relied upon the insurance company's representation. *Herman v. Valley Ins. Co.*, 145 Or. App. 124, 133-34, 928 P.2d 985 (1996); *Johnson v. Kentner*, 71 Or. App. 61, 73, 691 P.2d 499 (1984). In order to assert equitable estoppel, the insurance company "must have done something that amounted to an affirmative inducement" that caused the party to delay in bringing an action. *Lyden v. Goldberg*, 260 Or. 301, 304, 490 P.2d 181 (1971). There must also be a "justifiable reliance" on the part of the policyholder. *Johnson*, 71 Or. App. at 72. Oregon courts have made clear that insurance companies may be equitably estopped from asserting a suit limitation provision as a defense to a claim on a policy. *Herman*, 145 Or. App. at 133 (collecting cases).

In its motion, Chartis incorrectly suggests that the elements of equitable estoppel require a fraudulent intent. Doc. 19 at 13-14. Oregon cases have conclusively held that fraudulent intent is not required to assert equitable estoppel:

> It is not necessary to the existence of an equitable estoppel that there should exist a design to deceive or defraud, but it is sufficient if the person against whom estoppel is asserted by his silence or representation has created a belief of the existence of a state of facts which it would unconscionable to deny.

*IKON Office Solutions, Inc. v. Am. Office Prods., Inc.*, 178 F.Supp.2d 1154, 1164 (D. Or. 2001) (quoting *Hess v. Seeger*, 55 Or. App. 746, 762, 641 P.2d 23 (1982)).  The doctrine of equitable estoppel prevents a party "from taking an inequitable advantage of a predicament in which his own conduct has placed his adversary."  *IKON Office Solutions, Inc.*, 178 F.Supp.2d at 1164 (quoting Prossor & Keeton on Torts, § 105 (5th ed.)).  That is exactly what occurred here.

Additionally, under Oregon law, a claim of equitable estoppel does not require the insurance company to make statements to the policyholder that are false or misleading.  Rather, the cases have confirmed that equitable estoppel can occur when a person is silent in the face of a duty to speak.  *See Stovall v. Sally Salmon Seafood*, 306 Or. 25, 34, 757 P.2d 410 (1998) (describing estoppel as "a person may be precluded by his act or conduct, or silence when it was his duty to speak, from asserting a right which he otherwise would have had").  Here, Chartis had a duty to speak under the Oregon insurance regulations:

> (6) If an insurer continues negotiations for settlement of a claim directly with a claimant who is neither an attorney nor represented by an attorney until the claimant's rights may be affected by a statute of limitations or policy time limit, the insurer shall give the claimant written notice that the time limit may be expiring and may affect the claimant's rights.  The notice shall be given to first party claimants not less than 30 days before, and to third party claimants not less than 60 days before, the date on which the insurer believes the time limit may expire.

OAR 836-080-0235(6).  According to the regulation, Chartis was required to inform of the suit limitation provision in the policy no less than 30 days before it asserts the period expired.  *See id.*

The undisputed evidence confirms that Chartis did not comply with its duty to inform Semler of the suit limitation provision until August 24, 2017, five years after the loss and approximately two years after Charis now contends the provision expired.  Chartis's failure to

inform Semler of the provision when it had the obligation to do so constitutes a "false representation" sufficient to support equitable estoppel.

The remaining elements for equitable estoppel are likewise satisfied.  Chartis knew of the suit limitation period it unilaterally drafted but chose not to inform Semler of it until more than years after it contends the suit limitation period began to run.  Chartis made specific notes regarding the length the claim had been pending.  Despite recognizing there may be time-related issues with the claim, Chartis failed to inform Semler of the requirements of the policy and continued to proceed with the claim in the normal course, only to pull the rug out from under Semler when it was too late.  Particularly when viewed in the light most favorable to Semler, Chartis's failure to inform Semler of the suit limitation period prior to August 24, 2017, was designed to lull Semler into continuing with the claim in the ordinary course with the effect that Chartis could shield itself from a lawsuit if the parties did not agree on the claim.  Chartis was the only party that could benefit from its delay in failing to properly disclose the suit limitation provision.  Now it attempts to take advantage of the position it created.

As discussed above, Semler was not aware that the policy contained a suit limitation provision or that Chartis was relying on it to bar further coverage for their claim.  There is no dispute that Chartis waited until August 2017 to tell him about it.  Semler reasonably and justifiably relied on Chartis's failure to speak in delaying to bring this lawsuit.  He continued to expend time and resources gathering information and preparing for the repairs to the home.  Chartis never cited to the provision or generally reserved its rights under the policy and continued to consider all information submitted in support of the claim.

Finally, Chartis's reliance on ORS 742.056 is unavailing.  The statute provides that an insurance company's investigation or negotiation of a loss, in and of itself, cannot provide the

basis for a claim of estoppel. *Id.* A case that is instructive on this point is *Great Am. Ins. Co. of N.Y. v. Jackson County Sch. Dist. No. 9*, 478 F.Supp.2d 1227 (D. Or. 2007). The court rejected the insurance company's implication of ORS 742.056, holding:

> The court finds that Great American did much more than investigate and negotiate School District's claim, it made affirmative representations to School District, it paid School District a portion of its claim, and it caused School District to change its position by expending moneys in preparation of building a new school and in anticipation of receiving replacement cost.

*Id.* at 1239. Based on these findings, the court rejected the insurance company's attempt to invoke time limitations defenses against the policyholder's claims.

This Court should hold likewise. Chartis's actions here amounted to more than simple investigation and negotiation. It affirmatively sought further information from Semler, issued additional payments, and encouraged them to engage a contractor to proceed with repairs. Given Chartis's requests and statements, Semler expended time and money to make the repairs to the home and respond to Chartis' requests in anticipation of receiving full policy benefits.

## CONCLUSION

For the reasons set forth herein, plaintiffs Dr. Herbert Semler and Shirley Semler respectfully request that the Court grant their cross-motion for summary judgment and deny the motion for summary judgment filed by defendant Chartis Property Casualty Company.

DATED this 10th day of August, 2018.

Respectfully submitted,

FOREMAN STURM & THEDE, LLP

By:*/s/ Nicholas A. Thede*
Kyle A. Sturm, OSB No. 080214
E-mail: kyle@foremansturm.com
Nicholas A. Thede, OSB No. 075460
E-mail: nick@foremansturm.com
*Attorneys for Plaintiffs*