UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DR. HERBERT SEMLER and SHIRLEY
SEMLER, individuals,

                      Plaintiff,

      v.

CHARTIS PROPERTY CASUALTY
COMPANY, a Pennsylvania company,

                    Defendant.

Case No. 3:18-cv-00624-AC

FINDINGS AND
RECOMMENDATION

---

ACOSTA, Magistrate Judge:

*Introduction*

    Plaintiffs Dr. Herbert Semler ("Dr. Semler") and his wife, Shirley Semler (collectively, the

"Semlers"), filed this lawsuit against their former insurer, Chartis Property Casualty Company, now

PAGE 1 - FINDINGS AND RECOMMENDATION

known as AIG Property Casualty Company ("AIGPCC"[1]), alleging several claims that stem from a coverage dispute arising from water damage caused by a supply line leak at the Semlers' beach house in 2012. Currently before the court is AIGPCC's Motion for Summary Judgment. (Def. Chartis Property Casualty Company's Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56, ECF No. 19 ("Motion")). AIGPCC argues the Semlers' claims are time-barred by a valid suit limitation provision contained in the Semlers' insurance policy. (*Id.* at 3.) For the reasons that follow, AIGPCC's Motion should be GRANTED.

*Background*

Since 1983, the Semlers have owned and frequented a beach house located at 1808 North Ocean Avenue in Gearhart, Oregon (the "Property"). (Decl. of Dr. Herbert Semler, ECF No. 23 ("Semler Decl."), ¶ 2; Compl., ECF No. 1 ("Compl."), ¶ 1.) From February 2012 to February 2013, the Property was covered by a homeowner's insurance policy issued by AIGPCC ("the Policy"), then doing business as Chartis Property Casualty Company. (Decl. of Kathleen Spinella in Supp. of Def.'s Mot. for Summ. J., ECF No. 20 ("Spinella Decl."), ¶ 2.) The Policy provided AIGPCC would pay reconstruction costs following a covered loss, as well as replacement costs for personal property damaged or destroyed as a result of such loss. (Spinella Decl., Ex. 1 ("Policy"), at 7–8[2].) Under the Policy, "reconstruction cost" meant the lesser amount required, at the time of loss, to either "restore

---

[1] The Semlers reference Defendant as "Chartis" in the Complaint and in their Response to this Motion. However, the court refers to Defendant as "AIGPCC" because Defendant is currently doing business as AIG Property Casualty Company. Thus, any reference to Chartis is a reference to AIGPCC.

[2] The pages of the Policy are numbered, but do not align with the ECF page numbers assigned to Exhibit 1. To avoid confusion, the court cites to the ECF page numbers when referencing Exhibit 1.

PAGE 2 - FINDINGS AND RECOMMENDATION

or repair a structure" or "replace or rebuild a structure" at the same location, "with materials of like kind and quality." (*Id.* at 7.)

In the event the Semlers and AIGPCC disagreed about the amount of compensable loss, the Policy provided specific avenues by which the Semlers could seek relief. As relevant here, the Policy contained a "Legal Action Against Us" clause, which provided:

> No action shall be brought against us unless the insured person has complied with this policy's provisions . . . You also agree to bring any action against us within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined

(The "LAAU Clause"). (*Id.* at 18.) Immediately below the LAAU Clause, the Policy also contained an "Appraisals" clause, which provided for independent appraisal and binding arbitration at the parties' request to resolve disputes regarding the appropriate amount of compensable loss. (*Id.*)

On June 5, 2012, a supply line in an upstairs bathroom of the Property leaked, causing water damage to the bathroom and the kitchen and pantry below. (Semler Decl. ¶ 3.) The Semlers reported the leak to AIGPCC on June 6, 2012. (Semler Decl. ¶ 3.) On June 7, 2012, AIGPCC sent Trevor Winter ("Winter"), an independent adjustor, to assess the severity of the damage to the Property. (Spinella Decl. ¶ 4.) Winter met with the Semlers, inspected the damage, and spoke with a contractor whom the Semlers had consulted about potentially performing the repairs to the Property. (*Id.*)

On July 30, 2012, AIGPCC sent a letter to inform the Semlers it had issued payment in the amount of $53,493.80. (Spinella Decl., Ex. 2, at 1.) AIGPCC clarified the payment specifically covered the emergency service costs associated with the leak and the estimated cost to restore the Property following the loss. (*Id.*) The letter further explained:

PAGE 3 - FINDINGS AND RECOMMENDATION

> We have issued payment based on our estimate; since your contractor has not
> provided one to us after multiple requests. We have also been advised that you had
> contents in the refrigerator that were affected by your loss. Your contract[or] has still
> not provided us a list of those items either. Please forward the list of spoiled food so
> we can evaluate those costs and issue payment to you for that loss.

(*Id.*) The payments owed for the spoiled food notwithstanding, the letter explicitly requested the

Semlers to contact AIGPCC if the amount paid "appears incorrect or you have any other questions

or concerns." (*Id.* at 2.)

Dr. Semler alleges he believed the payment was merely "an initial advance on [the] claim."

(Semler Decl. ¶ 5.) Though he did not think the payment would be "sufficient to repair the damage

to the home," the Semlers communicated no objections or concerns regarding the timing of the

payment or its amount. (Semler Decl. ¶¶ 5, 6.) The Semlers cashed the check on August 8, 2012,

and there was no further contact between the Semlers and AIGPCC from July 2012 until April 2014.

(Spinella Decl. ¶ 5; Semler Decl. ¶ 6.)

In April 2014, the Semlers' insurance broker, Rosana Carr ("Carr"), sent AIGPCC an invoice

for 38 hours of "concept design" work performed by an architect retained by the Semlers, totaling

$5,700.00. (the "Invoice"). (Decl. of Rosanna Carr, ECF No. 24 ("Carr Decl."), Ex. 3.) In the

accompanying message, Carr relayed the Semlers' desire to "reopen" the 2012 water damage claim,

and instructed that the work identified in the Invoice should be reimbursed as part of that claim. (*Id.*;

Spinella Decl. ¶ 7.)

AIGPCC did not object to Carr's submission of the Invoice or otherwise challenge the

Invoice as untimely. (Carr Decl. ¶ 4.) Rather, AIGPCC requested additional information identifying

the exact nature of the architectural services provided, as it was unclear from the Invoice whether

the work performed was related to the water damage claim. (Spinella Decl., Ex. 3, at 1, 2.) Though

PAGE 4 - FINDINGS AND RECOMMENDATION

AIGPCC made multiple requests for more information and informed Dr. Semler it could not determine if the work was covered otherwise, the Semlers never provided AIGPCC with additional information or documentation related to the Invoice. (Spinella Decl. ¶ 7.)

On April 23, 2014, Winter met with the Semlers and their insurance brokers in Portland. (*Id.* ¶ 8.) During the meeting, Winter discussed the Invoice, the Semlers' search for a new contractor, and payments for spoiled food items and personal property damaged by the 2012 leak. (Semler Decl. ¶ 8.) Regarding the Invoice, Winter explained that it was unlikely architectural services would be covered under the Policy, and "after much discussion," Dr. Semler understood and agreed to provide further information about the services rendered. (Decl. of Nicholas A. Thede, ECF No. 25 ("Thede Decl."), Ex. 1 ("File"), at 9.) Though repairs to the Property had not been started in the two years since AIGPCC issued payment for the loss, Winter nevertheless agreed to review an estimate submitted by the Semlers' contractor once one had been chosen. (Spinella Decl. ¶ 8; File, at 8–9.)

In the weeks that followed, the Semlers did not contact Winter or AIGPCC. (*Id.*) On June 20, 2014, AIGPCC entered notes documenting the Semlers' inactivity in their claim file[3], recommending the file should be closed if the inactivity continued. (*Id.* at 9.) The notes further indicated AIGPCC considered Winter's meeting with the Semlers on April 23, 2014 "a courtesy meeting" because it had already "paid all [it] owe[d]" in connection with the 2012 water damage claim. (*Id.* at 9.) The same day, Winter sent a message to the Semlers seeking an update on their progress. (*Id.*) The Semlers responded a week later, informing Winter they still had not chosen a

---

[3] The relevant portions of the file maintained by AIGPCC (doing business as Chartis) in connection with the 2012 water damage claim is attached to the Thede Declaration as Exhibit 1.

PAGE 5 - FINDINGS AND RECOMMENDATION

contractor.  (*Id.* at 10.)  Winter warned the claim would be closed due to inactivity unless a contractor was chosen and an estimate promptly secured.  (*Id.* at 10.)

Shortly thereafter, the Semlers requested Greg Larson Construction ("Larson") to submit an estimate for the repairs to the Property.  (Semler Decl. ¶ 10.)  Winter received a copy of Larson's estimate in early August 2014.  (File, 10–11.)  Upon review, Winter noted Larson's estimate accounted for several line items — including new bathroom fixtures, a new bathroom sink and toilet, fresh shower tile, a new medicine cabinet, towel bars, blinds, and new kitchen appliances — that were not damaged or otherwise affected by the 2012 leak.  (*Id.* at 11.)  All together, Larson estimated the work proposed would cost $98,092.50 to complete.  (*Id.*)

After receipt of the estimate, Winter met with Larson and conducted a walk-through of the Property.  (File, at 12.)  Winter and Larson inspected "each area where there was damage related to the loss and discussed the estimate amount."  (*Id.*)  During the walk-through, Larson revealed that he had prepared his estimate "based on what the insured had indicated they wanted done," rather than what was necessary to return the Property to its original condition.  (*Id.*; Spinella Decl. ¶ 9.)  After meeting with Winter, Larson revised his estimate, lowering his proposal to $56,748.00 to complete only those repairs necessary to return the Property to its pre-loss condition.  (Spinella Decl., Ex. 4, at 2; File, at 13.)  Winter similarly adjusted his own estimate, increasing the total cost of the anticipated repairs to $53,989.36.  (Spinella Decl. ¶ 10.)

On October 9, 2014, AIGPCC issued a "final supplement check" to the Semlers to account for Winter's increased repair cost estimate, spoiled food items, and damaged personal property.  (*Id.* ¶ 11.)  In a letter, AIGPCC provided an accounting of the supplemental payment amount and explained:

PAGE 6 - FINDINGS AND RECOMMENDATION

> We have reviewed the reports from Mr. Trevor Winter. The additional costs for food
> are allowed though no repairs were started on the home within a normally reasonable
> amount [of] time. As this is a secondary home approximately 1½ hours from your
> permanent residence we feel this is a fair settlement.

(Spinella Decl., Ex. 6.) AIGPCC also sent an email regarding the supplemental payment to Anne

Duden ("Duden"), another insurance broker working with the Semlers, requesting that she "review

[the bases for the supplemental payment] with Dr. Semler as we have issued our settlement check."

(Spinella Decl., Ex. 7, at 1.) The email expressly echoed the position taken by AIGPCC in its letter

to Dr. Semler, stating "the settlement is fair," and directing Duden to "see our closing letter." (*Id.*)

Further negotiations between the Semlers and AIGPCC resulted in an upward adjustment of

the final supplemental payment, and a new check for the adjusted amount was issued on October 24,

2014. (Spinella Decl. ¶ 12.) The same day, AIGPCC sent an email to Dr. Semler, Duden, and Carr,

providing a breakdown of the adjusted total — including the "total claim owed"and "final" amounts

for food items and damaged personal property — and addressing the Semlers' concerns regarding

the amount of the original supplemental check issued October 9, 2014. (Spinella Decl., Ex. 8, at

4–5.) Less than a week later, on October 29, 2014, Carr notified AIGPCC that Dr. Semler was "not

satisfied with the settlement" because it would not be enough to complete the repairs to the Property.

(*Id.* at 4.) She also asked what documentation AIGPCC required to consider reimbursing the

Semlers for the architect fees outlined in the Invoice submitted five months earlier. (*Id.*)

In an email sent to Dr. Semler, Carr, and Duden on November 3, 2014, AIGPCC denied

further payment and explained, in relevant part:

> We have paid what we owe for the structure repairs. The [amount paid] would be
> enough to complete the work to the home to put it back to the condition it was prior
> to the loss happening. The insured's contractor has written an estimate that was to
> remodel the kitchen and bathroom, not repair it. We only owe to put the dwelling

PAGE 7 - FINDINGS AND RECOMMENDATION

back to its original condition when the loss occurred on June 5, 2012.

(*Id.* at 1.) In response to Carr's inquiry about the Invoice, the email clarified:

> Your architect was not willing to assist in providing what was need[ed] to determine what her billing was for . . . We need to see what the vendor did for the insured such as drawings, reports, breakdown of hours and what they were spent for. The invoice presented is based on some work product.
>
> When Trevor Winter first met with all and discussed the architect fees, it was explained what was needed to determine if any of their fees would be considered. Trevor asked for copies of the plans or drawings completed by the architect to determine if any of them were to depict how the home was prior to the loss or if the drawings/plans were only remodels of the space. No drawings/plans were ever provided to him or to us. No further detail explaining the architect fees have been provided.
>
> The way the invoice reads, it was only rendering remodeling plans, not repair plans. Based on the damages incurred, there would not need to be an architect involved to complete the repairs to the home to place it back to its original condition. If anything can be presented to the contrary we will gladly review it.

(*Id.*) The email concluded: "As of now our settlement stands." (*Id.*)

Dr. Semler accepted the supplemental payment issued October 24, 2014, but claims he "did not believe . . . [it] was sufficient to perform the repairs on the home or otherwise resolve the claim." (Semler Decl. ¶ 13.) Rather, despite the emphatic denial of further liability communicated in the email sent November 3, 2014, Dr. Semler insists he believed AIGPCC "would continue to accept and consider additional information, adjust [the] claim, and issue further payments." (*Id.*) Though allegedly dissatisfied with the settlement, the Semlers did not object or otherwise respond to AIGPCC's email or the statements made therein. (Spinella Decl. ¶ 12.) In fact, following the November 3, 2014 email, there was no further communication between the Semlers and AIGPCC until 2017. (*Id.*)

On July 19, 2017, almost three years after AIGPCC issued the final supplement check, Carr

PAGE 8 - FINDINGS AND RECOMMENDATION

sent an email to AIGPCC stating that Dr. Semler wished "to reopen this water damage claim" because he had "incurred additional expenses in completing the repairs of his home." (Carr Decl., Ex. 3.)  Carr also attached a one-page lump sum estimate drafted by contractor Tim Beatty ("Beatty"). (Spinella Decl., Ex. 9.)  The estimate proposed "corrective repairs" to be completed as follows:

> To remod[el] kitchen and have powder room and laundry on the same floor.  We have to remove lower laundry room and most of [an] upper bedroom to make this work according to drawing supplied by owner.  And save the tile in upper bath, shower.

 (Spinella Decl., Ex. 9.)  Beatty estimated the work proposed would cost $150,000.00 to complete. (*Id.*)

On July 20, 2017, AIGPCC responded to Carr's email and provided her with a copy of the email sent November 3, 2014, to "shed some light on [the water damage] claim that is now over 5 years old." (File, at 15.)  AIGPCC also provided her with a copy of the Larson estimate, noting that "Mr. Larson had agreed at the time to the proposed estimate to repair the water damaged items . . . included [in] our independent[] repair estimate for $53,989.36." (*Id.*)  Turning to the Beatty estimate, AIGPCC posited that the work proposed would not have been covered by the Policy, and requested that Carr clarify the exact nature of the additional expenditures. (*Id.*)  In response, Carr suggested AIGPCC contact Dr. Semler directly, as he had "been advised by other professionals that his claim is not settled and he is still owed reimbursement." (File, at 16.)

Consequently, AIGPCC requested Winter to meet with Beatty in order to "review [the] findings and scope" of the loss as he had documented in 2014. (*Id.* at 17.)  On August 14, 2017, Winter met with Beatty and the Semlers at the Property. (*Id.* at 22.)  Beatty provided floor plans

PAGE 9 - FINDINGS AND RECOMMENDATION

detailing the work proposed, which Winter noted involved improvements to areas unaffected by the 2012 loss. (*Id.*) During a walk- through of the Property, Beatty informed Winter that he had been "unaware . . . this [was] an insurance claim" when he drafted his estimate, basing his plans solely on architectural drawings provided by the Semlers. (*Id.*) Following the meeting, Winter submitted a report to AIGPCC explaining the work proposed and documenting his discussions with the Semlers and with Beatty. (Spinella Decl., Ex. 10.)

After reviewing Winter's report, AIGPCC sent Dr. Semler a letter dated August 24, 2017, reiterating that "the policy owes to put the dwelling back to its original condition after a loss," and denying additional coverage for proposed work that was "not related to the ensuing water damage from the June 5, 2012 water damage claim." (Spinella Decl., Ex. 11, at 1.) The letter explained that AIGPCC was "at this time closing the claim as we have verified that no additional monies are owed," and provided relevant portions of the Policy for Dr. Semler's review, including the LAAU Clause. (*Id.* at 2.) Until receipt of the August 24, 2017 letter, the Semlers and Carr allege they were unaware of "any time limitation" that might bar legal action against AIGPCC. (Semler Decl. ¶¶ 17, 18; Carr Decl. ¶ 9.) Further, neither the Semlers nor Carr knew AIGPCC intended to rely on the suit limitation provision until it was referenced, for the first time, in the August 24, 2017 letter. (*Id.*)

On September 1, 2017, the Semlers objected to AIGPCC's denial of further payment and requested appraisal and arbitration as provided by the Policy. (Spinella Decl., Ex.12, at 1.) In a letter sent to the Semlers and Carr dated September 21, 2017, AIGPCC recounted the history of the claim, explaining that AIGPCC had issued payments, investigated two requests to "reopen" the claim, and had previously denied coverage for work exceeding the scope of repairs necessary to restore the areas affected by water damage. (*Id.* at 1–2.) Because Dr. Semler again attempted to

PAGE 10 - FINDINGS AND RECOMMENDATION

"'re-open' [the] loss determination" five years after the loss occurred, AIGPCC concluded Dr. Semler's request was untimely. (*Id.* at 2.) Specifically, AIGPCC asserted that after the November 3, 2014 email, "Dr. Semler had a year to challenge our loss determination, whether by appraisal (and subsequent binding arbitration) or lawsuit," but that he had failed to do either. (*Id.*) AIGPCC further explained that the decision to wait five years before beginning a "substantial remodel of his home does not grant Dr. Semler a perpetual right to re-open his claim in violation of the one year suit limitation clause." (*Id.* at 3.) Due in large part to the untimeliness of Dr. Semler's actions, AIGPCC declined the request to initiate appraisal and arbitration and declared "Dr. Semler's claim settled and this matter closed." (*Id.*)

On April 13, 2018, nearly six years after the loss occurred, the Semlers filed this lawsuit against AIGPCC alleging, *inter alia*, that AIGPCC's refusal to issue further payments for the 2012 loss constituted breach of contract. (Compl., ¶¶ 21–32.) On July 20, 2018, AIGPCC filed this Motion for Summary Judgment.

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, unsupported conjecture, or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary

PAGE 11 - FINDINGS AND RECOMMENDATION

judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

To determine whether summary judgment is proper, the court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## *Discussion*

AIGPCC moves for summary judgment, arguing this lawsuit is untimely under the suit limitation provision contained in the LAAU Clause, or, in the alternative, under Section 742.240 of the Oregon Revised Statutes ("ORS"). (Motion, at 3.) The Semlers deny this action is untimely and allege AIGPCC's conduct throughout the life of the water damage claim warrants the imposition of equitable estoppel to nullify AIGPCC's reliance on any time-based limitations contained in the Policy. (Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 22 ("Pl.'s Opp'n"), at 16–19.) The court first considers the timeliness of this action under the terms of the Policy before then turning to the

PAGE 12 - FINDINGS AND RECOMMENDATION

question of whether AIGPCC should be estopped from asserting any time-based limitations, particularly the suit limitation provision, as an affirmative defense in this lawsuit.

I.        Whether This Action is Timely Under the Terms of the Policy

AIGPCC argues it is entitled to summary judgment because the Semlers brought suit long after the limitation period set forth by the Policy expired.  As noted, *supra*, the suit limitation provision is part of the LAAU Clause, which provides, in relevant part:

> You also agree to bring any action against [AIGPCC] within one year after a loss occurs, but not until thirty (30) days after proof of loss has been filed and the amount of loss has been determined.

(Policy, at 18.)  The parties agree the requisite one-year limitation period begins to run 30 days after proof of loss is filed by the insured and the amount of that loss is determined by the insurer. (Motion, at 9; Pl.'s Opp'n, at 12.)  The Policy, however, does not define or otherwise clarify the circumstances under which the amount of loss is considered "determined," nor do the parties agree as to the appropriate interpretation of that term as it is used here.  Consequently, the parties dispute at what point the limitation period began to run in this case.  The court therefore must decipher when the amount of loss is reasonably considered "determined" under the Policy in order to establish the date on which the limitation period began to run — and ultimately to establish whether this case is timely.

A.        *Applicable Law*

Federal courts sitting in diversity must apply state substantive law and federal procedural law. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  However, the distinction between the procedural and substantive is not always clear.  *Id.*  In parsing the procedural from the substantive, courts must determine whether the statute in question has "so important an effect on the

PAGE 13 - FINDINGS AND RECOMMENDATION

fortunes of one or both of the litigants that failure to apply it" would lead to inconsistent results or would lead to judicial forum shopping. *Hanna v. Plummer*, 380 U.S. 460, 468 n.9 (1965). More recently, the Supreme Court held that a state statute is substantive if it "significantly affects the result of a litigation" on the merits. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 406 (2010).

An insurance policy is a contract. *Stewart v. Morosa Bros. Transp. Co.*, 611 F.2d 778, 781 (9th Cir. 1980). The Ninth Circuit, as well as courts in this district, have long held that contract interpretation is a matter of substantive law to which state law applies. *Getlin v. Maryland cas. Co.*, 196 F.2d 249, 250 (9th Cir. 1952); *see also Snook v. St. Paul Fire & Marine Ins. Co.*, 220 F. Supp. 314, 316–17 (D. Or. 1963) ("This being a diversity case, jurisdiction is grounded on that fact and the [insurance] policy must be interpreted and construed in accordance with the Laws of Oregon, the place where the contract was made."). In Oregon, the proper construction of an insurance policy is evaluated using the interpretive framework set forth by the Oregon Supreme Court in *Hoffman Constr. Co. of Alaska v. Fred S. James & Co. of Oregon*, 313 Or. 464, 469, 836 P.2d 703 (1992). Under *Hoffman*, "[t]he primary and governing rule of the construction of insurance contracts is to ascertain the intention of the parties." *Id.* (quoting *Totten v. New York Life Ins. Co.*, 298 Or. 765, 770, 696 P.2d 1082 (1985)). The parties' intentions are determined by looking to the terms of the policy, and the way such terms are defined by the policy. *Id.*

However, if the policy is silent regarding a crucial term, the court must resort to a three-step analysis which relies on "'various aids of interpretation to discern the parties' intended meaning.'" *Malbco Holdings, LLC*, 629 F. Supp. 2d at 1193 (quoting *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 308–08, 985 P.2d 1284 (1999)). First, the court must determine whether the contested

PAGE 14 - FINDINGS AND RECOMMENDATION

term has a "plain meaning, *i.e.*, whether it is susceptible to only one plausible interpretation." *Malbco Holdings, LLC*, 629 F. Supp. 2d at 1193–94 (quoting *Holloway v. Republic Indem. Co. of Am.*, 341 Or. 642, 650, 147 P.3d 329 (2006)). When a plain meaning is readily apparent, the court applies that meaning and goes no further in the analysis. *Id.* at 1194. If, however, more than one plausible interpretation can be attached to the term at issue, the court must then analyze the term "in light of the particular context in which [it] is used in the policy and the broader context of the policy as a whole." *Id.* If more than one interpretation remains plausible after viewing the policy "by its four corners," the term is ambiguous and "any reasonable doubt as to the intended meaning of such a term will be resolved against the insurance company." *Id.* However, the Oregon Supreme Court has warned against resorting to this final measure too hastily, for "given the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel." *Hoffman Const. Co.*, 313 Or. at 470. Only when "'two or more plausible interpretations of [the contested] term withstand scrutiny, i.e. continue to be reasonable'" after thorough analysis, is it appropriate to resolve any lingering ambiguity against the insurer. *Malbco Holdings, LLC*, 629 F. Supp. 2d at 1194 (quoting *Holloway*, 341 Or. at 650).

B.      *When the Amount of Loss is "Determined"*

AIGPCC contends a loss is "determined" when an insurer has made an offer to settle a claim or denies a claim. (Motion, at 9–11.) Under that interpretation, AIGPCC argues the amount of loss was determined on November 3, 2014, when it sent the Semlers and their insurance brokers an email which "unambiguously communicated . . . [that AIGPCC] had determined the amount of structural loss for which it owed coverage and had paid the Semlers in settlement of that amount." (*Id.* at 11.) The Semlers offer a narrower interpretation, alleging the amount of loss is not determined until all

PAGE 15 - FINDINGS AND RECOMMENDATION

investigations and negotiations related to the claim have ceased and the insurer "unambiguously and conclusively" communicates a "final" decision to the insured. (Pl.'s Opp'n, at 15.) The Semlers thus contend the amount of loss was not determined until September 21, 2017, when AIGPCC sent a letter unequivocally denying further payments on their claim and declaring the matter closed. (*Id.*)

Because the Policy is silent as to when "the amount of loss has been determined," the court must ascertain whether that phrase has a readily apparent plain meaning or if it is susceptible to more than one interpretation. *Holloway*, 341 Or. at 650. The parties agree the issue turns on the meaning of "determined" as that term is used in the LAAU Clause. (Motion, at 9; Pl.'s Opp'n, at 14.) To decipher the plain meaning of an undefined term, Oregon courts consistently "reference . . . the usual source of ordinary meaning, the dictionary." *Ortiz v. State Farm Fire and Cas. Co.*, 244 Or. App. 355, 360, 260 P.3d 678 (2011); *see also Pension Trust v. Travelers Cas. & Sur. Co. of Am.*, 235 Or. App. 573, 584 (2010) ("[W]e generally turn to dictionary definitions to determine the ordinary meanings of undefined terms").

The Semlers cite *Webster's Third New International Dictionary*, which defines "determine" as follows:

> **1 a :** to fix conclusively or authoritatively <a council was set up to determine national policy> **b :** to settle a question or controversy about : decide by judicial sentence <the court heard and *determined* the plea> **c :** to come to a decision concerning as the result of investigation or reasoning <an attempt to determine the date of his death> **d :** to settle or decide by choice of alternatives or possibilities <determine the list of guests to be invited> **e :** to set up as a goal or purpose : resolve upon <when did Thoreau determine to become a man of letters –H.S.Canby>

(Unabridged, 1966) (Boldface in original). The Semlers argue that, "based on this definition of 'determine,' the plain meaning requires . . . the decision [to] be final (*i.e.*, conclusive, authoritative, settled)." (Pl.'s Opp'n, at 15.) The Semlers contend that a decision is not "final" — and thus, the

PAGE 16 - FINDINGS AND RECOMMENDATION

amount of loss has not been determined — "when there is a continuing investigation or negotiation on the issue." (*Id.*) AIGPCC does not directly address the plain meaning of the phrase at issue, simply alleging "determined," as that term is used here, is not ambiguous. (Def. Chartis Prop. Cas. Co.'s Reply in Supp. of Mot. for Summ. J., ECF No. 26 ("Def.'s Reply"), at 5.) AIGPCC argues, however, that the Semlers advance an unsupported definition of "determined" which would ultimately create new ambiguities if applied. (*Id.* at 6.)

The Semlers' "plain meaning" interpretation does not rest on any single definition of "determine" recited above. Rather, their analysis appears anchored in the collective inclusion of the terms "conclusively," "authoritatively," and "settle[d]" across multiple definitions, regardless of the context in which those terms appear. The Semlers thus advance a "plain meaning" that is derived from a loose combination of the various definitions attributable to the term "determine," selectively relying on fragments they find favorable. They apparently overlook that the entirety of the third definition ("definition 1c") — "to come to a decision concerning as a result of investigation or reasoning" — is at the heart of the interpretation they attempt to advance. In fact, *both* parties offer competing interpretations that assume a coverage decision is made by AIGPCC based on its investigation of the claim; they simply disagree as to whether that decision must be "final." Thus, despite the Semlers' insistence that their piecemeal definition controls in this case, "determine," as that term is clearly understood by both parties, refers to the exact meaning articulated by definition 1c — the act of arriving at a decision as a result of investigation or reasoning.

Consequently, the Semlers' contention that the amount of loss is determined only after AIGPCC makes a *final* decision attempts to stretch the meaning of "determine" beyond its reasonable parameters. There is no language in definition 1c to suggest the decision reached must

be final, it simply must be the product of investigatory efforts or reasoned consideration, whether or not those efforts are ongoing. This absence is particularly conspicuous when such language is explicitly included in the various definitions of "determine" relied on by the Semlers. It can be reasonably inferred from the express inclusion of terms such as "conclusive" and "settled" in alternative definitions that if finality in fact was part of the meaning applied here, definition 1c would explicitly say so. The court thus rejects the Semlers' attempt to inject into "determined" an element of finality that is not contemplated by the applicable definition, and declines to find such an element is implied when language that would compel its incorporation is deliberately excluded.

The Semlers' position only becomes more untenable when considered in the context of the Policy. The phrase, "after the amount of loss has been determined," is plainly one fragment of a suit limitation provision that requires an insured to bring legal action against the insurer "within one year after a loss occurs, *but not until* thirty (30) days after proof of loss has been filed and the amount of loss has been determined." (Policy, at 13 (emphasis added).) In Oregon, a contractual suit limitation is valid and enforceable provided it is reasonable. *Herman v. Valley Ins. Co.*, 145 Or. App. 124, 129–130, 928 P.2d 985 (1996), *rev. den.*, 325 Or. 438, 939 P.2d 621 (1997) Oregon courts favor the inclusion of a suit limitation provision in insurance policies because an insurer cannot "accurately forecast its future liabilities, set aside proper reserves, or close even ancient claim files" when such a provision is absent. *Id.* at 133. The court can reasonably conclude that the limitation provision at issue here, when read as a whole, was "designed to prevent the policyholder from commencing an action against the carrier until the carrier has had the opportunity to review and consider the claim and decide on whether to settle or deny the claim." *Secord v. Chartis Inc.*, No. 09 Civ. 9934 (SAS)(FM), 2011 WL 814743, at *3 (S.D.N.Y. Mar. 7, 2011) (quoting *Erlichman v. Encompass Ins.*

PAGE 18 - FINDINGS AND RECOMMENDATION

*Co.*, No. 13432–02, 2004 WL 1433085, at \*5 (Sup. Ct. Nassau Co. June 18, 2004).  In other words, the insurer's determination of the amount of loss — its arrival at a coverage decision after it investigates the claim — is a condition precedent that is intended to prevent the filing of a lawsuit before an actual dispute ripens between the insurer and the insured.  Once a dispute exists, the onus is on the insured to promptly file suit within one year, should they choose to do so.

The Semlers assert the amount of loss is determined and the limitation period begins to run only after AIGPCC issues a coverage decision that is final, meaning all negotiation and investigation of a claim has ceased.  Though they do not clarify what may constitute "investigation" or "negotiation," or whether such efforts must be continuous, the Semlers allege AIGPCC has continued to investigate and negotiate throughout the life of the water damage claim — their significant delay in starting the repairs, extended periods of inactivity following payment by AIGPCC, and multiple requests for their claim be "reopened" to address additional expenses notwithstanding.  From such application, the court infers that a "final decision," as envisioned by the Semlers, is not made if an insurer at any point investigates the legitimacy of an insured's request to reopen a claim, even if that request is made years after payment intended to settle the claim has been made and all communication between the parties has ceased.  Taken to its logical extreme, such an interpretation would give the insured the power to reset the limitation period at will by delaying repairs and submitting requests to reopen the claim as unexpected expenses arise, needing only to persuade the insurer to evaluate the validity of such requests.  Indeed, an insured could keep her claim alive simply by submitting an invoice to the insurer that was vague enough to elicit a response asking about the basis of the invoice.  In other words, the insured would maintain unilateral control over finality, which, under the interpretation advanced by the Semlers, controls when the amount of

PAGE 19 - FINDINGS AND RECOMMENDATION

loss has been determined.  Such an outcome would deprive the insurer of its ability to properly forecast its liabilities and to ever consider a claim definitively closed, contrary to Oregon law.

Similar concerns were articulated in *Majagah v. AIG Prop. Cas. Ins. Agency, Inc.*, Civil Action No. 15-cv-06178-SDW-SCM, 2016 WL 475362, at *1 (D.N.J. Feb. 8, 2016).  In that case, frozen water pipes burst in the plaintiff's home, causing water damage.  *Id.*  After his insurer denied coverage, the plaintiff sought further review of his claim, resulting in a second denial letter that stated "[n]o further payments will be made on this claim."  *Id.*  More than 13 months later, the plaintiff brought suit, compelling the defendant insurer to invoke the suit limitation provision contained in the plaintiff's insurance policy — a provision virtually identical to the suit limitation provision at issue here.  *Id.*  The insurer alleged the suit was untimely because the amount of loss was determined, at the latest, when the second denial of coverage was issued more than 13 months prior.  *Id.* at *3.  The plaintiff argued the suit limitation provision prohibited him from filing suit until all the repairs were completed because the amount of loss could not have been determined until that point.  *Id.* at *2.  The plaintiff claimed the amount of loss was only then being "determined" because he was still "finishing up the repairs to the property," and thus his suit was timely.  *Id.*

Though undefined by the policy, the district court held the suit limitation provision was not ambiguous, concluding "the only reasonable interpretation is that the loss has been determined at the point when 'the insurance company has made an offer to settle or has denied a claim.'"  *Majagah*, 2016 WL 475362, at *3.  The district court explained that its construction of the suit limitation provision was "reasonable insofar as it provides Defendant with an opportunity to determine the amount of any covered loss to the insured before a lawsuit may be filed, while also allowing the insured a full twelve months in which he or she could file a lawsuit."  *Id.*  In finding the plaintiff's

suit untimely, the district court made clear that the plaintiff's interpretation of the suit limitation provision was unreasonable because it "would give Plaintiff complete control over when a loss is 'determined' since it would depend on the pace at which Plaintiff completed the repairs." *Id.*

AIGPCC urges this court to adopt the reasoning of the *Majagah* court because "within the context of a homeowners' policy, [the] only reasonable interpretation is that a loss is 'determined' when AIGPCC either (1) denies coverage or (2) communicates that it has settled the claim and owes nothing further." (Def.'s Reply, at 5.)  The Semlers offer little with regard to contextual analysis, but contend *Majagah* is distinguishable.  Specifically, the Semlers allege New Jersey law adheres to the doctrine of reasonable expectations, whereas Oregon law requires analysis of the plain meaning of contested terms without reference to the expectations of the parties. (Pl.'s Opp'n, at 14.)  The fact that Oregon and New Jersey have differing analytical frameworks, however, fails to persuasively distinguish *Majagah*.  Though the doctrine of reasonable expectations — which "'permit[s] a construction that favors [the] expectations of the insured'" — is referenced in *Majagah*, it is not implicated unless the court must interpret an insurance policy provision that is ambiguous.  *Majagah*, 2016 WL 475362, at *3.  The *Majagah* court expressly found the suit limitation provision was *not* ambiguous, therefore the doctrine of reasonable expectations was not applied to reach the construction advanced in that case.  Furthermore, even if the *Majagah* court had found the suit limitation provision was ambiguous and had applied the doctrine of reasonable expectations, the doctrine is not so different from the final step in Oregon's three-step analysis — resolving ambiguity against the insurer in favor of the insured — as to divest the district court's reasoning of any and all persuasive value.

In light of this court's analysis and the persuasive reasoning of *Majagah*, the interpretation

advanced by the Semlers is not plausible. Such an interpretation would place unilateral control in the hands of the Semlers, and it is unreasonable to presume AIGPCC intended the limitation provision to divest it of any control over its exposure to civil liability. If given the Semlers' meaning, the limitation provision would allow an insured to withhold objection and sit on her rights before finally deciding to seek legal intervention. No reasonable insurer, including AIGPCC, would enter an agreement that would leave it perpetually exposed to the threat of litigation or punish it for making a good faith effort to evaluate a request to reopen a claim. Accordingly, the court concludes that when they agreed to the terms of the Policy, the parties did not intend for the amount of loss to be "determined" only when AIGPCC engaged in the formality of issuing a "final" coverage decision and officially closing the claim after all investigation and negotiation ceased.

Conversely, AIGPCC's contention that the amount of loss is "determined" when it denies the claim or makes an offer to settle the claim is plausible. First, a decision that a claim is worth zero dollars, and therefore must be denied, or a decision that a claim is worth a specific dollar amount, giving rise to a settlement offer for that amount, are both decisions reached after AIGPCC investigates the claim. Such an interpretation thus rests squarely within the plain meaning of "determined" as that term is used here. Second, AIGPCC's interpretation does not implicate any of the concerns raised above. When applied, AIGPCC's interpretation does not give the insured the unilateral ability to dictate when the limitation period starts to run because the limitation period is decisively triggered by the insurer's initial determination of the claim, regardless of what that determination might be. Such an outcome leaves room for continued investigation of a claim and negotiation between the parties, and gives the insured a full 12 months to consider whether a lawsuit is necessary to reach a fair settlement. The interpretation advanced by AIGPCC thus results in a

finite and determinable limitation period that enables the insurer to conclusively close old claims and accurately forecast its liabilities, while encouraging the insureds to promptly have the damage assessed and the repairs expeditiously completed in case legal action is necessary. The court therefore finds the only reasonable interpretation of "determined" under the Policy is the interpretation articulated in *Majagah* and advanced by AIGPCC — when the insurer denies the claim or makes an offer to settle the claim.

Applying this interpretation, the court agrees the amount of loss was determined on November 3, 2014, when AIGPCC unequivocally informed the Semlers that it had determined and paid the amount owed to repair the damage. Though an initial payment was issued in 2012, AIGPCC acknowledged it still owed money on the claim for spoiled food and damaged personal items, indicating the claim remained open. The Semlers failed to provide AIGPCC with the information necessary to fully settle the claim in 2012, but AIGPCC nevertheless adjusted the claim and issued additional payment on November 3, 2014 to settle the claim. At that time, AIGPCC unambiguously stated that it had paid what it believed it owed for the repairs and that it stood behind its settlement in the email to the Semlers. Once communicated to the Semlers, AIGPCC's assertion that the claim was settled triggered the limitation period, which began to run 30 days later on December 3, 2014.

Under the applicable one-year limitation period, the Semlers were required to file this lawsuit before December 3, 2015. Because the Semlers did not file suit until April 13, 2018, this action is untimely under the terms of the Policy. Accordingly, AIGPCC's Motion for Summary Judgment should be GRANTED unless estoppel applies.

//////

PAGE 23 - FINDINGS AND RECOMMENDATION

C.      *Whether the Policy Must be Construed to Comply with the Requirements of ORS 742.240*

AIGPCC contends the court must determine whether the statutory limitation provision set forth by ORS 742.420[4] must be "read-in" to the Policy.  (Motion, at 11–12.)  The Semlers do not dispute AIGPCC's assertion that this lawsuit is time-barred if subject to the requirements of ORS 742.240.

ORS 742.240 requires certain insurance policies, including homeowner's insurance policies, to contain a provision similar to the suit limitation provision at issue here:

> No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 24 months next after inception of the loss.

OR. REV. STAT. § 742.240; *Herman*, 145 Or. App. at 126 n.1.  In this context, "inception of the loss" refers to the direct incident causing property damage rather than the accrual of the insured's cause of action.  *Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp. 2d 1185, 1191 (D. Or. 2009) (citing *Bell v. Quaker City Fire & Marine Ins. Co., Philadelphia*, 230 Or. 615, 623, 370 P.2d 219, 223 –24 (1962)).  Thus, under the limitation provision of ORS 742.240, legal actions brought more than two years after the damage occurred are time-barred.  *Id.*

ORS 742.240, however, is not a statute of limitation.  *Ben Rybke Co. v. Royal Globe Ins. Co.*, 293 Or. 513, 518, 651 P.2d 138 (1982).  Rather, it simply "requires a particular contractual arrangement between the parties to insurance policies."  *Id.*  ORS 742.240 therefore is not intended to provide the "maximum time in which a lawsuit may be filed," but to "take from insurers the power

---

[4] The suit limitation statute was originally ORS 743.660 until renumbered as ORS 742.240. Additionally, the statute was amended by Oregon Laws 1991, chapter 437, section 1, to increase the required limitation period from 12 months to 24 months.

PAGE 24 - FINDINGS AND RECOMMENDATION

to contractually impose a short limitation of less than [24] months." (*Id.*)  In keeping with such purpose, courts must construe an insurance policy that does not comply with ORS 742.240 as "contain[ing] any mandatory statutory requirements that it omits." *Olson*, 112 Or. App. at 361.  Thus in cases where "the limitation period in the policy is ineffective, the applicable limitation is the [two]-year period under ORS 742.240." *Id.*

The suit limitation provision contained in the LAAU Clause requires the insured to bring a legal action within one year "after a loss occurs," a full year shy of the 24-month minimum set forth by ORS 742.240.  However, the parties agree the one-year limitation period does not begin to run until 30 days after the amount of loss has been determined — a condition precedent which delayed the running of the limitation period in this case until after the two-year minimum required by ORS 742.240 had already elapsed.  (Motion, at 12; Pl.'s Opp'n, at 12.)  Accordingly, AIGPCC contends, and the Semlers do not dispute, that under the facts of this case, the suit limitation provision effectively complies with the statutory requirements of ORS 742.240, and therefore controls here. (*Id.*)

The court agrees.  The Oregon Supreme Court has made clear that the requirements of ORS 742.240 operate as a statutory floor for a specific contractual term, rather than as a statute of limitation. *Ben Rybke Co.*, 293 Or. at 518.  Therefore, the court's obligation to construe an insurance policy to include the suit limitation set forth by ORS 742.240 is implicated only when a suit limitation provision is wholly absent or when the suit limitation contained in an insurance policy "is ineffective" — *i.e.*, when the contractual suit limitation provision effectively bars legal action brought less than 24 months from the date the damage occurred.

Here, the LAAU Clause provides a limitation period of only one year, but the limitation

period did not start running immediately upon the event that caused the damage. Instead, the limitation period began to run 30 days after AIGPCC determined the amount of loss on November 3, 2014 — over two years after the supply line leak caused the water damage at issue. Thus, the practical effect of the suit limitation provision in this case is to extend the limitation period beyond the minimum two-year requirement of ORS 742.240. Because the LAAU Clause has not imposed a limitation period that is effectively shorter than 24 months from the date on which the leak occurred, the court is not obligated to apply the statutory suit limitation provision set forth by ORS 742.240, and the LAAU Clause is controlling as-written in this case.

II.    Estoppel

The doctrine of equitable estoppel is intended to "'protect those who materially change their position in reliance upon another's acts or representations.'" *Stovall v. Sally Salmon Seafood*, 306 Or. 25, 34, 757 P.2d 410 (1988) (quoting *Bash v. Fir Grove Cemeteries Co.*, 282 Or. 677, 687, 581 P.2d 75 (1978). To that end, estoppel may preclude a person, "by his act or conduct, or silence when it is his duty to speak, from asserting a right to which he otherwise would have had." *Day v. Advanced M&D Sales*, 336 Or. 511, 518, 86 P.3d 678 (2004) (quoting *Marshall v. Wilson*, 175 Or. 506, 518, 154 P.2d 547 (1944)). Equitable estoppel is applicable when the following elements are met:

> [T]here must (1) be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; [and] (5) the other party must have been induced to act upon it.

*Day*, 336 Or. at 518–19 (internal quotation marks omitted). "Although those elements suggest that proof of fraudulent intent is necessary . . . such proof is not required." *Johnson v. Kentner*, 71 Or. App. 61, 72, 691 P.2d 499 (1984).

PAGE 26 - FINDINGS AND RECOMMENDATION

Under appropriate circumstances, equitable estoppel can prevent an insurer "'from asserting a suit limitation provision as a defense to liability on an insurance policy.'" *Brockway v. Allstate Prop. and Cas. Ins. Co.*, 284 Or. App. 83, 89, 391 P.3d 871 (2017) (quoting *Herman*, 145 Or. App. at 133). In such cases, the insurance company "must have done something that amounted to an affirmative inducement that would cause [the] plaintiff to delay" filing a lawsuit. *Herman*, 145 Or. App. at 134. However, there must "be a justifiable reliance by the party seeking to invoke estoppel, and that reliance must be reasonable." *Johnson*, 71 Or. App. at 72. (citing *Bash v. Fir Grove Cemeteries Co.*, 282 Or. 677, 687, 581 P.2d 75 (1978)).

The Semlers claim estoppel is warranted because AIGPCC had a duty to speak with regard to the suit limitation provision and neglected to do so. (Pl.'s Opp'n, at 17.) Specifically, the Semlers allege AIGPCC failed to inform them the Policy contained a suit limitation provision or provide them with notice that the limitation period had started to run as required under Oregon law. (*Id.* at 17–19.) The Semlers thus argue AIGPCC's conduct "was designed to lull [them] into continuing with the claim in the ordinary course with the effect that Chartis could shield itself from a lawsuit if the parties did not agree on the claim." (*Id.* at 18.) AIGPCC refutes the Semlers' arguments, alleging they have failed to provide evidence on which a reasonable fact-finder could conclude it made a false representation intended to induce the Semlers to delay filing this lawsuit. (Motion, at 13–14.)

The Semlers argument rests on the requirements of Oregon Administrative Rule ("OAR") 836-080-0235(6)[5] (the "Rule"), which provides:

If an insurer continues negotiations for settlement of a claim directly with a claimant

---

[5] OAR 836-080-0235(6) was previously numbered OAR 836-080-0235(5).

PAGE 27 - FINDINGS AND RECOMMENDATION

who is neither an attorney nor represented by an attorney until the claimant's rights may be affected by a statute of limitations or policy time limit, the insurer shall give the claimant written notice that the time limit may be expiring and may affect the claimant's rights. The notice shall be given to first party claimants not less than 30 days before, and to third party claimants not less than 60 days before, the date on which the insurer believes the time limit may expire.

The Semlers allege the Rule imposed a duty on AIGPCC to inform them of the suit limitation provision no less than 30 days before the limitation period expired. (Pl.'s Opp'n, at 17–18.) The Semlers argue AIGPCC's failure to do so constitutes a dereliction of this duty such that it equates to a "false representation" sufficient to meet the first element of estoppel.

AIGPCC had no general obligation to remind the Semlers of the suit limitation provision contained in the Policy. *See Herman*, 145 Or. App. at 134 (stating that an insurer was not required to remind the insured that her insurance policy contained a suit limitation provision, though it expressly did so). Thus, whether estoppel is warranted by AIGPCC's silence as to the impending expiration of the limitation period rests on the Rule. The Rule, however, requires written notice explaining the effect of the suit limitation provision only if continued negotiations threaten the claimant's rights— *i.e.*, the claimant's ability to seek legal recourse — by distracting from the imminent expiration of the applicable statute of limitation or suit limitation provision. *See* OR. ADMIN. R. 836-080-0235(6). When such rights are considered "affected" is not defined by the Rule, but the requirement that a first-party claimant must be notified "not less than 30 days" before the limitation period expires is instructive.

The Semlers' last contact with AIGPCC prior to the expiration of the limitation period on December 3, 2015, was November 3, 2014, when AIGPCC sent an email addressing the Semlers' objections to the amount of the final supplement check and denying further coverage — giving the Semlers over a year to contemplate bringing suit without the distraction of active negotiations. More

PAGE 28 - FINDINGS AND RECOMMENDATION

than one year is a reasonable time in which to bring a lawsuit, and therefore the negotiations that abruptly concluded in November 2014, even when viewed most favorably to the Semlers, cannot be said to have interfered with the Semlers' right to file a lawsuit. The Rule thus does not apply.

However, even if the Rule applied, the Semlers' argument still would fail. In *Johnson v. Kentner*, the plaintiff attempted to invoke estoppel based on the insurer's failure to comply with the Rule. 71 Or. App. at 74. The Oregon Court of Appeals rejected the plaintiff's argument, explaining that the purpose of the Rule was "'to define certain minimum standards the violation of which will be considered to constitute unfair claims settlement practices,'" not to 'in any way expand or limit or otherwise change the procedural or substantive rights . . . of claimants as provided in Oregon Revised Statutes.'" *Id.* Because a penalty for violating the rule was already provided by statute, the Court of Appeals determined that the application of estoppel based on noncompliance with the Rule "not only would enlarge plaintiff's rights, but essentially would create a judicial remedy not contemplated within the statutory scheme." *Id.* at 75. Thus, AIGPCC's alleged violation of the Rule is not a viable basis for estoppel.

Even assuming, *arguendo*, that AIGPCC's silence as to the suit limitation provision could constitute a false statement, there is no evidence which could lead a reasonable fact-finder to conclude that AIGPCC affirmatively induced the Semlers to delay filing this lawsuit or that the Semlers justifiably relied on the actions of AIGPCC in waiting until 2018 to initiate legal action. First, AIGPCC did not affirmatively discourage the initiation of legal action or attempt to persuade the Semlers to extend negotiations by offering to waive its reliance on the suit limitation provision. Rather, AIGPCC investigated the merits of the Semlers' requests to reopen their claim, sought clarification of the vague invoices they submitted for reimbursement to determine if such expenses

PAGE 29 - FINDINGS AND RECOMMENDATION

were covered, and encouraged the expeditious settlement of the claim when the Semlers still had not begun the repairs or even hired a contractor two years after the damage occurred. Such actions were nothing more than claims processing conducted in the normal course of doing business.

Second, the Semlers' belief that AIGPCC would "continue to accept and consider additional information, adjust our claim, and issue further payments" is unreasonable in light of AIGPCC's issuance of a "*final* supplement check" and the email sent November 3, 2014, which unequivocally stated AIGPCC had "paid what we owe for the structure repairs." (Spinella Decl., Ex. 8, at 1.) That the same email made reference to AIGPCC's willingness to consider additional information is of no consequence, as such willingness was extended for the singular purpose of allowing the Semlers to rebut AIGPCC's determination that architectural services were unnecessary to address the water damage. AIGPCC thus made clear that it was willing to consider information with regard to the architect fees detailed in the Invoice, but that otherwise, "our settlement stands." (*Id.*) The Semlers never attempted to rebut the denial of coverage for the architect fees, but waited almost three years to request coverage for additional work which appeared unrelated to the water damage covered by the Policy. AIGPCC was emphatic in its denial of further liability in the November 3, 2014 email, and the Semlers neglected to challenge that denial in a timely manner.

The Semlers therefore fail to present evidence that would lead a reasonable fact-finder to conclude AIGPCC's conduct affirmatively created "a belief of the existence of a state of facts which it would be unconscionable to deny." *Johnson*, 71 Or. App. at 73 (quoting *Hess v. Seeger*, 55 Or. App. 746, 762, 641 P.2d 23 (1982)). Accordingly, AIGPCC should not be estopped from invoking the suit limitation provision contained in the Policy as an affirmative defense in this case.

/ / / / / /

PAGE 30 - FINDINGS AND RECOMMENDATION

*Conclusion*

For the foregoing reasons, AIGPCC's Motion for Summary Judgment (ECF No. 19) should be GRANTED.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due July 16, 2019. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this _1st_ day of July, 2019.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 31 - FINDINGS AND RECOMMENDATION